HOLROYD ET, PLAINTIFFS, *v.* EIBLING ET, DEFENDANTS.

Common Pleas Court, Franklin County.

No. 208541.   Decided June 14, 1961.

*Mr. Paul M. Herbert,* for plaintiffs.
*Mr. Russell Leach,* city attorney, for defendant.

SATER, J.  The Columbus Board of Education is the lawful controlling body of the School District of the City of Columbus, Ohio.  Two of its employees, who carry into effect its official acts, are Harold Eibling, Superintendent of the Columbus Public Schools, and Edgard W. House, Principal of Columbus North High School.  This Board acts for the purposes of this case, under the first clause of Section 3 of Article VI of the Constitution of Ohio:

"Provision shall be made by law for the organization, *administration and control* of the public school system of the state supported by public funds," * * *

and under two sections of the Revised Code, which sections go back many decades to their origin and which delegate very broad powers to local boards of education.  This must of necessity be so done to enable local boards to meet local conditions.  The first of these two sections is Section 3313.20, Re-

vised Code, and provides that "The board of education shall make such rules and regulations as are necessary for its government and *the government of its employees and the pupils of the schools.*" The other section is Section 3313.47, Revised Code, and provides that, "Each city, exempted village or local board of education shall have *the management and control of all the public schools of whatever name or character in its respective district.*" These mandates and delegations of authority clearly place school boards in loco parentis of students attending their schools for purpose of creating and carrying into effect a statewide system of public education fitted to the needs of each local community as to detail.

Recognizing for some years that the existence and influence of some types of high school fraternities, sororities, clubs and organizations were the "number one" problem of the Columbus public school system, and mindful in the premises of its official duties, the Columbus Board of Education duly enacted on March 15, 1960, its Regulation 10.22 which reads as follows:

"Section 10.22 Prohibition Upon Public Affiliation with Certain Organizations.

" (a) It shall be unlawful for any pupil enrolled in the Columbus Public Schools, in any manner, to organize, join, or belong to any school fraternity, sorority, society, or organization, as defined in sub-section (b), or to solicit members for such organizations, or to attend meetings of such organizations, or to engage in activities sponsored by such organizations, or to wear or display rings, pins, or any type of emblem, symbol or attire, which signifies or designates membership in any such organizations. Any such fraternity, sorority, society or organization as defined and referred to in this section, is declared an obstruction to education, inimical to the best interests of the Columbus Public Schools and to the public welfare, and illegal.

" (b) For purposes of this section, a school fraternity, sorority, society or organization, referred to in sub-section (a) is hereby defined and determined to be any organization whose active membership is composed wholly or in part of pupils enrolled in the Columbus Public Schools, and which perpetuates itself by admitting additional members from the pupils enrolled in the Columbus Public Schools on the basis of the deci-

sion of its membership rather than upon the right and free choice of any pupil who is qualified by the rules of his school to be a member of and take part in any class or group exercises designated and qualified according to sex, subjects required by the course of study, or program of school activities fostered and promoted by his school, except for organizations officially approved by the Superintendent of Schools as having sufficient education merit to justify their existence.

"(c) Any pupil enrolled in the Columbus Public Schools, who is in violation of this Section, shall be barred from, declared ineligible for and shall forfeit his right and opportunity to participate in any athletic, literary, military, musical, dramatic, service, scientific, scholastic, and other similar activities and organizations of his school, including honor societies or honor organizations. It is the purpose and intent of such bar to cause the forfeiture of participation in those activities and organizations incidental to regular school work.

"Such pupil shall also be barred from declared ineligible for, and shall forfeit his right and opportunity to hold any school or class office, to participate in any class election, to receive any honor whatsoever based upon scholastic or other achievement, or to represent the school in any activity or organization.

"(d) It shall be the duty of the principal of each school of the Columbus Public School System to enforce the provisions of this section, subject, however, to the right of the Superintendent of the Columbus Public School System, at his discretion, to review the actions of the school principal in the performance of the duties enjoined upon him by this section.

"(e) The provisions of this section shall be in force and shall apply to all students enrolled in the Columbus Public School System, who are scheduled for graduation during or after June, 1962."

This action is brought to enjoin temporarily and permanently the enforcement of this Regulation (or any similar type of regulation which the Columbus Board of Education may enact). The plaintiffs are two students at Columbus North High School and their respective parents. As to the parents, they bring this action as taxpayers on behalf of themselves and other parents similarly situated; the students likewise participate on the same basis of a class suit. The defendants are

Messrs. Eibling and House. Before any further discussion of this case takes place herein, it may be at once noted that this Court will not rule on or enjoin enforcement of any regulation, similar or otherwise, which the Columbus Board of Education may enact at some unknown future date; all such matters will be considered and determined when they arise, not before.

Disposition of this case turns on the answer to just two questions: (1) Is Regulation 10.22 unlawful? (2) If it is not, is it such an abuse of administrative discretion as to require equitable relief? The answer to both of these questions is in the negative. We will consider them in turn.

1. The length and breadth of the power of local boards of education to regulate is amply covered by the two statutes and the constitutional provisions quoted above. For other uses of that power, see *Brannon* v. *Board of Education*, 99 Ohio St., 369, 373-374; *State, ex rel. etc.*, v. *Board*, 88 Ohio App., 364, 374; *Board of Education* v. *State, ex rel. etc.*, 80 Ohio St., 133, syll. 2; *Sewell* v. *Board of Education*, 29 Ohio St., 89; and *Dworken* v. *Board of Education*, 63 Ohio Law Abs., 10, 15-16, app. dis., 156 Ohio St., 346. See also various of the authorities hereinafter cited. There is no question of the lawful power and authority of the Columbus Board of Education to enact and to enforce where applicable Regulation 10.22.

2. Regardless how sweeping the allegations of a petition may be as to the claimed beneficial results of a particular course of action or non-action, it is very difficult to prove actionable abuse of discretion on the part of a public body possessing administrative or legislative rule-making powers. For the legislative process, at least equally with the judicial, there is an indeterminate penumbra within which choice is uncontrolled. *Dayton P. & L. Co.* v. *P. U. C. O.*, 292 U. S., 290, 309, 78 L. ed., 1267, 1280. We are not here required to demarcate a school board's duties and responsibilities in matters requiring discretion; nor could the General Assembly without running the risk of possible hardships, injury or extravagance chart the limits in all cases and define them. Something - - and that something has fundamental substance - - must be left to the judgment of board members; and this can be done only through the process of delegated power. In this field, courts may interfere with the discretion of the school board only when they find a clear abuse of discretion.

Let us turn now to Regulation 10.22 and then to the pleadings and evidence.

Three matters may be noted in limine with regard to this Regulation. (1) It is city-wide in application. (2) It is a toned-down, more workable version of an earlier form of the same Regulation which plaintiffs assert was recognized to be contrary to the Constitution and laws of the State of Ohio, though this assertion is at best of extremely doubtful validity. See, for example *Board of Trustees* v. *Waugh*, 237 U. S., 589, 59 L. ed., 1131; *Isgrig* v. *Srygley*, 210 Ark., 580, 197 S. W. (2d), 39, *Antell* v. *Stokes*, 287 Mass., 103, 191 N. E., 407, and *Wilson* v. *Abilene (Texas) School District*, 190 S. W. (2d), 406. (3) This Regulation 10.22, even in its present form, is not being enforced pending the outcome of this case. Plaintiffs consequently have not yet been adversely affected by the Regulation nor is there definite assurance that they ever will be; especially since both defendants have testified that they will have to investigate each of the six "clubs" in question before deciding whether they fall within the ambit of Regulation 10.22. If this third comment is not dispositive of this case, as being premature, we will continue with the pleadings and evidence.

Although their petition is directed at a district-wide Regulation, plaintiffs' presentation of their case was directed entirely and solely to the existence and propriety under this Regulation of six clubs at North High School: Siote, Arro, Waikiki, Link, Okay and York. Membership in these six clubs constitutes at present just about 10 percent of the School's enrollment of 1900. Yet, according to one of plaintiffs' witnesses, these clubs compose, for example, 92 percent of the student council, 55 percent of its executive committee, 70 percent of the staff of the Polaris (the School periodical), 32 percent of "Y-Teens," 37 percent of the School choir, 83 percent of the cheerleaders' organization, 57 percent of the baseball team, 100 percent of the science club, 54 percent of the student court, 77 percent of the book club, 80 percent of the queen (homecoming?) and court, and 48 percent of Varsity N. This bespeaks far more than aptitude and brillance (especially when club membership calls for no more than a 2.0-2.5 scholastic standing). Furthermore, every witness for plaintiffs resides north of Arcadia Avenue and, so far as the record shows, every club member except

a mere few, lives north of that Avenue, none at all south of Fifteenth Avenue.

The salient allegations of the petition are, by themselves, impressive; but on analysis they do not always stand up. For example, a scholastic average of 2.0 to 2.5 is a condition precedent to acquire and hold club membership, but since the record is silent as to both North High School and school district scholastic averages, the only conclusion to be drawn is that no more than average grades are required—a C, or average, grade being 2.0, and C-plus being 2.5. The clubs meet at the homes of parents, yet the only mother who testified, stated that although she is a member of her child's mothers' club, she had never attended a club meeting or initiation of her child's club, did not know the basis on which the club issued invitations to prospective new members, and knew about the purposes of the club only what her child told her. The clubs as such, never conduct any of their activities on school property, yet the percentage statistics set out above are beyond the realm of coincidence; the same is true of club sponsorship of and participation in school activities. Club meetings are closely supervised but the record is almost totally silent as to the nature and extent of that supervision; one boy's club is counselled and advised in a manner very similar to a scoutmaster with his troop. Club dances are well chaperoned but it is only reasonable to assume that the same is true of any youth or school-sponsored dances.

The clubs promote high moral and social conduct, but so also do parents, churches and schools; the same is true of smoking and drinking, in public at least. Club meetings are not secret and are attended by parents and advisors; but the record discloses no great effort to invite or bring about either parental or advisor attendance; no parent or advisor spoke of attending a club meeting; no public notice of any sort is given of such meetings; one therefore would have to hunt out a club meeting to attend, and while some club members stated that meetings of their clubs were open, others stated that if a non-member happened into a club meeting, he would have to be voted on before he would be admitted to the meeting. The clubs have no secret initiation or ritual but no form of induction or procedural ceremony was offered in evidence, and every club

witness spoke knowledgeably of "initiations," "bids," "rush," "rushing," "pledges," seasons for rushing, and "actives and pledges," i. e., the typical jargon of any fraternity or sorority. The clubs participate in public charitable activities and Exhibit A indicates a cash disbursement by their inter-club council of $2,819.94 over an eight year period; but if we assume an average annual membership of 190, this means a little more than $1.84 per member per year. And so on through several other allegations, some of which sound hauntingly like portions of the preamble to the constitution of The American Legion, and all of which can be more beneficially accomplished on a large scale than when confined to just six clubs.

Finally, despite the definition set out in paragraph (b) of Regulation 10.22, it is alleged that these six clubs are not fraternities or sororities in any sense of the word. Maybe not in word per se or in Greek letters, but the substance presents a different picture. All vote on new members and in some of the clubs no reason need be given to support a "NO" vote; even those with the required scholastic standing may be voted down. All clubs have a pin or ring (or both) and a seal. All six clubs have a "court" though its functions are none too well defined in the record. Occasionally a club has a member enrolled at some other school, but usually that one is a transfer student from North High School. Applications from "outside" students may be received by a club but most student witnesses had never seen an outside application and the record is silent that an outside applicant ever became a member.

Continuing, since only one club constitution was offered in evidence (see Exhibit B), we can assume no more than that it is illustrative of the constitutions of the other five clubs. Several portions of this one exhibit are enlightening. Paragraph III, 14, provides that at the Christmas spread "the pledges" are not to be regarded as such; IV, 3, places the vice-president in charge of "rushing teas," requires the recording secretary to send welcome notes to all "rushees," and prescribes the duties of the "Pledge Mistress" and the "Rushing" chairman. Article VII, 6, states that "Pledging and initiation procedure shall be carried out as designated in the Blue Book" (whatever that may be); Article VIII, 8, k, that "No member shall inform a pledge when she is to go on 'props' or tell a pledge

about procedure in the Blue Book and rough and formal initiation" nor shall a pledge on "props" discuss or show her letter to anyone except her family and any active club member, nor take her "prop" letter to school. Article XII is devoted entirely to "Rushing Procedure." Article XIII requires a pledge who resigns or is depledged to turn in her pin; also that a stranger shall be voted on by the club before being permitted to attend any of that club's functions except open dances. At the end of this exhibit is a page devoted to the club's founding:—It began on June 1, 1903, as the Gamma Chapter of a national Greek letter high school sorority, but owing to the existence of certain laws "concerning the breaking up of all high school sororities," the chapter charter was returned to the donor in 1916; but at the same time the local, i. e., Columbus, members decided "to make a charter of their own and not to break up under any conditions"; the name then taken was an abbreviation of the full three Greek letters, "the pins were changed and also some parts of the initiation." Bluntly, this club may be no more than a disaffiliated local of former national affiliation; just as though, for instance, Waikiki or Link might once have been Lambda Sigma's local. But this is for defendants to determine at the proper time.

In passing, the most tragic note in the testimony was that two of these six clubs had each taken in a student as a special member against the consent of the student's parent—a sort of frater in urbe; one club told the parents of the action taken, the other did not.

But now having touched on the highlights of the evidence and in view thereof, can it be said that the enactment, and ultimate enforcement if it comes to that, of Regulation 10.22 constitutes an actionable abuse of administrative discretion? The overwhelming weight of authority is in the negative. It must be borne in mind that under this Regulation, no student will be expelled from school or denied a public school education; nor will they be subject to penal fine; they are simply required to choose between school-sponsored office and club affiliation. Nor are they required to take a stultifying pledge that they are not and will not become members of the proscribed type of organization. If parents are uncertain what types of organizations are proscribed, they can read Regulation 10.22 or discuss

it with the proper school authorities, or both. There is a hollow ring to the allegations that this Regulation will impose a year-round control over student activities at school or anywhere else, thus denying or jeopardizing parental responsibility in selecting associates and controlling their childrens' associations outside of school hours and away from school property and barring parents from opening their homes to their childrens' associates. Nothing in the record supports these allegations. Since these clubs are alleged to participate in community growth and development, to combat juvenile delinquency, to learn first hand the responsibilities and duties of state and local government, to maintain high scholastic standards, to participate in school activities, and to encourage real patriotism, the parents should do no less; but it must be borne in mind that the area covered by these purposes is Columbus, not Clintonville. Contrary to these parental fears, one thinks back to the stern admonition given each year by the venerable dean of a certain college in his annual convocation address to each freshman class, "In this college, gentlemen, it is *always* College first, class second, and fraternity third. See to it that there is *never* any deviation from this order of priority." Finally, it was never brought to light why the existence of some types of clubs is essential to the accomplishment of any or all of the stated purposes of these six clubs. If they are so essential, parental control is not being hampered, it has been sadly remiss; church youth organizations must certainly cover many, if not all, of these stated purposes; and the same is true of school-sponsored organizations with the only exception that church and school organizations work on a scale many-fold greater than these clubs or any like them. Certainly there is good cause shown for the enactment of Regulation 10.22 with its incidental power to investigate.

Other states have other statutes and different words may be used. Some decisions deal with colleges, others with high schools; some deal with Greek letter fraternities, others with clubs. But the goal is a common one: public scholastic education for all students who seek it. We consequently look to the substance rather than the form.

In *Wilson* v. *Board of Education*, 233 Ill., 464, 84 N. E., 697 (which case was approved and followed in *Favorite* v. *Board*

*of Education*, 235 Ill., 314, 85 N. E., 402), injunctive relief was denied from a rule which provided ''That no student who is known to be a member of a fraternity or sorority, or other so-called secret society, be permitted to represent the school in any literary or athletic contest or in any other public capacity.'' Similar to the case before us, the petition in the *Wilson case* alleged ''the aim of the society is to stimulate loyalty and fidelity to the teachers and schools, and a desire for a high scholarship and commendable individual action; that said society is not opposed or in any manner detrimental to the welfare of the school; that complainants and other pupils belonging to the society live with and are under the control of their parents and have their consent to be members of said association.'' The petition alleged that the rule was an arbitrary exercise of power by the board of education, was violative of plaintiffs' natural rights, was unlawful and discriminatory against them, and was therefore null and void. Said the Court:

''It is not claimed nor averred in the bill that plaintiff in error was deprived, by the rule in question, from attendance at the school, nor from taking his place in the classes to which he belonged and pursuing his studies, and receiving instruction, the same as all other pupils in the school, in the course of studies taught therein. It appears from the averments of the bill that there were associations permitted to be organized among the pupils of said Hyde Park High School, principally for literary, musical, and athletic exercises and contests; but these were not a part of the course of study required to be pursued by pupils attending said school and were not within the contemplation of the Constitution nor of the act of the Legislature in providing a system whereby all the children of the state may receive a good common school education. The power of the board of education to control and manage the schools and to adopt rules and regulations necessary for that purpose is ample and full. * * *

''* * * Assuming, as we must, that the adoption of the rule was not an abuse of power or discretion conferred by law upon the board, courts cannot, and should not, interfere with its enforcement. Pupils attending the schools may decide for themselves whether they prefer membership in the secret societies, with the disqualification from representing their schools in

literary or athletic contests or other public capacities or whether they prefer these latter privileges to membership in said societies. It is for the board of education, within the reasonable exercise of its power and discretion, to say what is best for the successful management and conduct of the schools, and not for the courts."

The rule—and the allegations of the petition for injunctive relief—in *Wayland* v. *Bd. of School Directors*, 43 Wash., 441, 86 Pac., 642, is very similar to that of the present case and also the *Wilson case*. In denying relief, the Court said:

"It will be observed that no attempt is being made by the respondents to deny appellant any instruction afforded by class work or by the required curriculum of the school. He is only denied certain other privileges such as participation in athletic, literary, military, musical, or class organizations. In other words, the respondents made it optional with appellant to determine whether, against the known wishes of the school authorities, he would continue his membership in said secret society, and thereby forfeit participation in the privileges above mentioned, which were no part of the class work or curriculum, or whether by complying with the adopted rules, he would elect to enjoy the privileges of which he is now deprived."

And again

"The only remaining question is whether the board of education had authority to adopt the rules complained of. Appellant insists that Section 2334, Ballinger's Ann. Code & St., provides who shall be admitted to the public schools, and that the board of education cannot exclude any pupils so entitled to attend. No issue need be taken with this contention. The board has not excluded the appellant from the Seattle High School, neither has it threatened to expel or suspend him. He can and does attend school, and, under our construction of the rules adopted, he is at the same time permitted to continue his membership in the Gamma Eta Kappa fraternity; although in doing so he opposes the authority of the board and thereby forfeits certain privileges which are no necessary part of the curriculum or class work from which he is not excluded. Respondents are only seeking to prevent appellant and his associates from dictating the terms on which they shall enjoy certain privileges which are merely incidental to the regular

school work, and this they have authority to do. Appellant further contends that, as the fraternities meet out of school hours at the homes of members, and at no time in the school building, and as their parents consent to this action, the board is exceeding its lawful authority in entering their homes, in withdrawing from parents the control of their children, and in dictating what the children shall or shall not do out of school hours. We think this contention unreasonable. The board has not invaded the home of any pupils, nor have they sought to interfere with parental custody and control. They have not said these fraternities shall not meet at the various homes, nor have they attempted to control students out of school hours."

And finally

"This being true, the board is authorized, and it is its duty, to take such reasonable and appropriate action by the adoption of rules as will result in preventing these influences. Such authority is granted by section 2339 and subdivisions 5 and 6 of section 2362, Ballinger's Ann. Codes & St. It would be difficult to confer a broader discretionary power than that conferred by these sections. Manifestly it was the intention of the Legislature that the management and control of school affairs should be left entirely to the discretion of the board itself, and not to the judicial determination of any court. These powers have been properly and legally conferred upon the board, and unless it arbitrarily exceeds its authority, which it has not done here, the courts cannot interfere with its action."

In denying relief from a similar rule in *Coggins* v. *Board of Education* (No. Car.), 28 S. E. (2d), 527, the court said:

"The rule makes no attempt to deny plaintiff any instruction afforded by class work or by the required curriculum of the school. Nor is he denied the right to participate in extra-curricular activities. It is merely made optional with him to determine whether, against the known wishes of the school authorities, he prefers to continue his membership in a secret society and thereby forfeit participation in the privileges afforded by the extra-curricular activities of the schools, which, by compliance with the rule, would be available to him. He has now arrived at one of the cross roads of life. He must decide which course he will take, and the choice is his."

And again,

"If the opinion of court or jury is to be substituted for the judgment and discretion of the board at the will of a disaffected pupil, the government of our schools will be seriously impaired, and the position of school boards in dealing with such cases will be most precarious. The Court, therefore, will not consider whether such rules and regulations are wise or expedient. Nor will it interfere with the exercise of the sound discretion of school trustees in matters confided by law to their discretion."

In *Antell* v. *Stokes, supra,* 287 Mass., 103, 191 N. E., 407, the court dealt with a rule, the penalty for the violation of which was expulsion. In denying relief from the rule, the court said,

"The rule of the school committee here attacked was well within the grant conferred by par. 47. The power in this particular as set forth in par. 47 manifestly extends to organizations designed to be operative away from the school premises and outside school hours. This is not an invasion of the domain reserved exclusively to home and family."

Other authorities to the same effect, some involving rules and some involving statutes are *Board of Trustees* v. *Waugh, supra,* 105 Miss., 623, 62 So., 827, affirmed 237 U. S., 589, 59 L. Ed., 1131, *Lee* v. *Hoffman,* 182 Iowa, 1216, 166 N. W., 565; *Wilson* v. *Abilene School Dist., supra,* 190 S. W. (2d), 406; *Bradford* v. *Board Ed'n.,* 18 Cal. App., 19, 121 Pac., 929; *Steele* v. *Sexton,* 253 Mich., 32, 138 N. E., 131; *Satan Fraternity* v. *Board of Public Instructions,* 156 Fla., 222, 22 So. (2d), 892; and *Webb* v. *State Univ. of N. Y.,* 125 Fed. Supp., 910, app. dism., 348 U. S., 867 (holding that the lack of notice is not a denial of due process). From the state decision in *Board of Trustees* v. *Waugh,* 105 Miss., 623, 62 So., 827, we quote:

"The Fourteenth Amendment to the Constitution of the United States was never intended to act as an accomplice to any young man who wanted to take advantage of the gratuitous advantages offered the youths to obtain an education, and yet to refuse to obey and submit to the disciplinary regulations enacted by the Legislature for the welfare of institutions of learning. The right to attend the educational institutions of the state is not a natural right. It is a gift of civilization, a benefaction of the law. If a person seeks to become a beneficiary of this gift, he must submit to such conditions as the law imposes as a condition precedent to this right. This act

92

in question is not class legislation. It is quite the reverse, and seeks to destroy the possibility of the existence of any class at the educational institution. No state or federal Constitution is violated by this Act in any way. Plaintiff is not deprived of any constitutional right unless plaintiff can be said to have a constitutional right to breach the discipline of the school and set at naught the laws of the state."

So it is in the case before us. Regulation 10.22 is neither unlawful nor an abuse of discretion. It is, finally, unnecessary to rule on defendants' motions to dismiss, although they are likely well taken.

A final matter in connection with this Regulation scarcely merits comment. Regulation 10.22 has a criminal counterpart in Section 2923.35, Revised Code. This statute is found in the Code chapter entitled "Crimes Against Society Not Otherwise Classified." That statute imposes a fine of ten to twenty-five dollars for each offense on any pupil in our public schools who shall organize, join or belong to a fraternity, sorority or *other like society* composed of or made up of pupils of the public schools. The Columbus Board of Education clearly adopted Regulation 10.22 as being a less onerous modus operandi than that of attaching a minor criminal record to many students under its jurisdiction as a sort of pre-commencement gift, free but not without charge; and, we believe, it is to be commended for its moderation.

Several points from plaintiff's brief may be quickly answered. (1) Just as Regulation 10.22 applies equally all over Columbus, so also do the statutes 3313.20 and 3313.47, Revised Code, along with the enabling constitution apply equally all over Ohio. (2) The rule-making power here did not come from Section 2923.25, Revised Code; it came from Sections 3313.20 and 3313.47(3), Revised Code. Regulation 10.22 was not promulgated by Eibling or House but from the Columbus Board of Education; they, properly, should be the defendants here. (4) There can be no statutory occupation of the field so long as rule-making power is vested by statute in local boards; otherwise we are asked to repeal a goodly portion of the two above statutes even though they, like Section 2923.25, Revised Code, have withstood outside pressure in at least two legisla-

tive sessions. (5) School boards and officials are responsible to the electorate; parent groups are not.

A decree may be entered for defendants.